UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----

HOWARD CHALFIN,

                              Plaintiff,

                -v.-

GOBIG SOLAR, LLC and DAVID COX,

                              Defendants.

----

24 Civ. 4768 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Howard Chalfin brought this *pro se* action against Defendants Go Big Solar, LLC ("Go Big Solar") and David Cox ("Cox") (collectively, "Defendants"), alleging claims of breach of contract, unjust enrichment, and tortious interference, all under New York law.  Defendants moved to dismiss Plaintiff's Second Amended Complaint (the "SAC") pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), 12(b)(6), and 12(b)(7) for lack of personal jurisdiction; improper venue; failure to state a claim upon which relief can be granted; and failure to join an indispensable party under Federal Rule of Civil Procedure 19.  Defendants also moved for sanctions against Plaintiff based on his conceded fabrication of a key document in the case.  For the reasons set forth in the remainder of this Opinion, the Court dismisses the SAC with prejudice and sanctions Plaintiff in the form of a $10,000 fine.

**BACKGROUND**[1]

**A.    Factual Background**

Plaintiff's allegations arise from the relationship between Iconoclast Advisors, LLC ("Iconoclast Advisors"), which was but is no longer a party to this action, and Go Big Solar, LLC ("Go Big Solar").  Plaintiff Howard Chalfin is the sole owner of Iconoclast Advisors, and David Cox is the owner of Go Big Solar. (SAC ¶¶ 2-3; Tr. 7).  Plaintiff alleges that he is in the business of using his "extensive professional network" to market and connect potential solar clients with Cox, who operates in the solar development sector.  (SAC ¶ 8).  Plaintiff is a resident of New York City.  (*Id.* ¶ 1).  Defendant Cox is a resident of Austin, Texas, and Defendant Go Big Solar is a Texas-based limited liability company with its principal place of business in Austin, Texas.  (*Id.* ¶¶ 2-3).

According to Plaintiff, the parties' relationship began in 2016 during Defendant Cox's "first trip to New York City," where "Plaintiff and Defendant formalized their working relationship and signed a Non-Disclosure and Non-

---

[1]    This Opinion draws its facts from the Second Amended Complaint (the "SAC" (Dkt. #17)), the operative complaint in this action, the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  The Court also relies, as appropriate, on the transcript of the November 7, 2024 pre-motion conference ("Transcript" or "Tr." (Dkt. #19)); the Declaration of David Cox and the exhibits attached thereto ("Cox Decl., Ex [ ]" (Dkt. #21-2)); and certain of the exhibits attached to the SAC ("SAC, Ex. [ ]" (Dkt. #17)), each of which is incorporated by reference in the SAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).  For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #21).  Plaintiff submitted two memoranda of law in opposition to Defendants' motion to dismiss.  The Court refers to the first memorandum as "Pl. First Opp." and the exhibits to this memorandum as "Pl. First Opp., Ex. [ ]" (Dkt. #23).  The Court refers to the second as "Pl. Second Opp." (Dkt. #24).  Finally, the Court refers to Defendants' memorandum of law in reply as "Def. Reply" (Dkt. #25).

Circumvention Agreement" (the "NDA").  (SAC ¶ 6).  This action centers on two versions of a 2018 Memorandum of Understanding, both of which are incorporated by reference in the SAC (as the Court discusses below, *see infra* Section C.2).  On or about October 25, 2018, Defendant Cox emailed a Memorandum of Understanding (the "October 25 MOU") to Plaintiff detailing the relationship between Go Big Solar and Iconoclast Advisors.  (Def. Br. 1; Cox Decl., Ex. B (the "October 25 MOU")).  The October 25 MOU outlines how the profits from two contemplated deals would be divided between Go Big Solar and Iconoclast Advisors.  (October 25 MOU).

Clause Four of the October 25 MOU states that "[a]n Addendum A will list all deals currently contemplated by the two parties," and that "future deals can be added as needed."  (October 25 MOU).  According to Addendum A, Iconoclast Advisors would receive thirty percent of the profits from the "Paul Quinn College deal" and fifty percent of the profits from the "Solaner Puerto Rico One/Alener Generacion, S.L." deal (the "Puerto Rico deal").  (*Id.*).  The October 25 MOU does not recite any other deals.  (*Cf. id.*).  Clause Three of the October 25 MOU states that the "70-30" and "50-50" split were merely two "options" on which the parties had agreed, and that "[o]ther options may be proposed by [the] parties."  (*Id.*).

The October 25 MOU submitted to the Court as an exhibit was signed by Cox but not by Plaintiff.  (October 25 MOU).  The record before the Court indicates that Cox emailed this agreement to Plaintiff on October 25, 2018, and requested Plaintiff's signature.  (Cox Decl., Ex. A).  According to the email

exchange, Plaintiff responded and said, "Will do this morning." (*Id.*, Ex. A at 2). It is unclear, however, if Plaintiff ever signed the October 25 MOU.

According to Plaintiff, Cox signed a *different* version of the MOU during Cox's trip to New York City in December 2018. (SAC ¶ 9; *id.*, Ex. A (the "December 6 MOU")). As support, Plaintiff proffers an email exchange with another individual indicating that Cox would be in New York City from December 4, 2018, to December 7, 2018. (*Id.*, Ex. B). The December 6 MOU that was submitted to the Court as an exhibit by Plaintiff purports to be signed by Cox and Plaintiff, and includes a third clause under Addendum A that sets out a separate agreement between Iconoclast Advisors and Go Big Solar with respect to the "City of Smithville, Bastrop County, TX" project (the "Smithville Project"), under which Iconoclast Advisors would receive thirty percent of the profits. (December 6 MOU). The clause also states that the Smithville Project was "[s]hown to ENGL, UGE, and Qcells 2020-2022," which of course postdates the ostensible execution date of the MOU. (*Id.*). At the end of that clause, it also states, simply, "Amended." (*Id.*).

Unsurprisingly, Defendants dispute the veracity of the December 6 MOU, as the document was signed in 2018 but mentions a project that would not be considered until 2020. (Def. Br. 2).[2] Defendants submit that the December 6 MOU "is an obvious forgery with language added by … Plaintiff," and they

---

[2]     Defendants also submit a 2024 email from Plaintiff wherein Plaintiff writes, "So you understand, I added Smithville to our MOU as nothing precludes me from doing so. Obviously, it comes years later and you will dispute it and that's what courts are for." (Def. Br. 19; Cox Decl., Ex. D). As discussed *infra*, Section C.2, the Court does not consider this email to be part of the pleadings for purposes of the motion to dismiss.

assert that the signatures on the MOU "appear to be added on." (*Id.* at 19). Among other changes, the font used for the title "Memorandum of Understanding" in the December 6 MOU differs from that of the October 25 MOU. (*Compare* October 25 MOU, *with* December 6 MOU). Cox asserts that he signed the October 25 MOU, but claims he never saw the December 6 MOU "prior to the Plaintiff's filing of it with the Court on December 13, 2024." (Cox Decl. ¶¶ 4, 14-19).

As it happened, the two projects that are referenced in both October 25 and December 6 MOUs — and thus are not disputed by the parties — never came to fruition. (Tr. 21). At some point after 2018, Go Big Solar and Cox initiated a deal with UGE International ("UGE") for the Smithville Project. Plaintiff alleges that he first introduced Defendant Cox to UGE representatives on January 20, 2020. (SAC ¶¶ 12-14). Plaintiff claims that he "contributed significantly to the sales and marketing of [the Smithville Project] and others by leveraging his expertise and professional network[.]" (*Id.* ¶ 14). In an email dated May 7, 2019, from Cox to Plaintiff, Cox states that Go Big Solar was "very close to winning an important contract to sell solar energy to the City of Smithville" and asks Plaintiff for his "support as a reference." (*Id.*, Ex. D). Plaintiff also claims he sent marketing materials provided to him by Cox to UGE and other "contacts" to promote Go Big Solar. (*Id.*, Ex. E). And Plaintiff was copied on a May 2021 email exchange between Cox and a member of the Puerto Rico deal that referred specifically to the Smithville Project. (*Id.*, Ex. F). Plaintiff alleges that the Smithville Project was sold to UGE in 2023. (*Id.* ¶ 18).

Plaintiff argues that Defendants' failure to compensate him for his work on the Smithville Project constitutes breach of contract, unjust enrichment, and tortious interference.  (SAC ¶¶ 20-31).  In particular, Plaintiff claims that Cox received $350,000 from selling the Smithville Project to UGE and seeks compensatory damages of "at least $350,000," disgorgement of profits derived from the Smithville Project, and other relief the Court deems "just and equitable."  (*Id.* at 4).[3]

## B.    Procedural Background

Plaintiff initiated the instant action on June 20, 2024, by filing his initial complaint.  (Dkt. #1).  There were initially two plaintiffs: Chalfin and Iconoclast Advisors.  (*Id.*).  Plaintiff was ordered to pay the filing fee on June 27, 2024.  (Dkt. #2).  The case was assigned to this Court on July 10, 2024.  (July 10, 2024 Minute Entry).  The Court issued an order of service on July 12, 2024, directing Plaintiff to serve the summons and complaint on each Defendant, and advising Plaintiff that limited liability companies may not appear without counsel.  (Dkt. #4).  The summons was issued to Defendants, and an information package including instructions for *pro se* litigants was mailed to Plaintiff on July 17, 2024.  (Dkt. #6, 7).  The summons was executed on September 4, 2024.  (Dkt. #8, 9).

---

[3]     To complete the factual record, the Court mentions, with a measure of dismay, that Plaintiff sent Defendants and defense counsel various inappropriate emails after commencing this action.  In these emails, Plaintiff writes things such as, "[j]ust all lies and fraud with you Dave," "[m]aybe get some sweet damages if they find you a dislikable small time shyster, which is exactly what you are," and "I think Dave is broke living paycheck to paycheck.  Make sure he stays current on his retainer if you want to get paid."  (Cox Decl., Ex. F).  The Court admonishes Plaintiff that his *pro se* status does not give him license to debase the dignity of the federal courts in this manner.

On September 9, 2024, Defendants filed a motion to dismiss in lieu of answer. (Dkt. #10). The Court terminated the motion to dismiss and instructed the Defendants to file a pre-motion letter pursuant to Rule 4 of this Court's Individual Rules of Practice in Civil Cases. (Dkt. #11). Plaintiff was instructed to file a response letter, and the Court set a date for a pre-motion conference for November 7, 2024. (*Id.*).

On September 28, 2024, Defendants filed a letter motion for leave to file a motion to dismiss and for sanctions. (Dkt. #12). On September 30, 2024, Plaintiff filed his First Amended Complaint. (Dkt. #13). Defendants then filed a second letter motion for leave to file a motion to dismiss and for sanctions directed at Plaintiff's First Amended Complaint. (Dkt. #14). Plaintiff filed his response letter on October 15, 2024. (Dkt. #15).

On November 7, 2024, the Court held a pre-motion conference via telephone. (November 7, 2024 Minute Entry). The Court instructed Plaintiff that he could not bring a *pro se* action on behalf of a limited liability corporation and granted Plaintiff leave to file a Second Amended Complaint ("SAC" (Dkt. #16)). During the conference, the Court also addressed the emails that Plaintiff sent to Defendants after the action commenced. (*Id.*). The Court ordered Plaintiff not to contact Defendant Cox directly about matters relating to the action. (*Id.*).

Plaintiff filed the SAC (and exhibits attached thereto) on December 13, 2024, removing Iconoclast Advisors as a plaintiff. (Dkt. #17). On January 17, 2025, Defendants filed their motion to dismiss and memorandum of law in

support thereof (Dkt. #21, 21-1), as well as the Declaration of David Cox (Dkt. #21-2) and the exhibits attached thereto (Dkt. #21-3 – 21-8).  On February 24, 2025, Plaintiff filed two memoranda of law in opposition to Defendants' motion to dismiss.  (Dkt. #23, 24).  These memoranda are similar in substance, but the first memorandum includes additional exhibits.  On March 4, 2025, Defendants filed a reply memorandum of law in further support of their motion.  (Dkt. #25).

## DISCUSSION

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question[s]." *Lugones* v. *Pete and Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 234 (S.D.N.Y. 2020) (internal quotation marks omitted) (citing *Arrowsmith* v. *United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963)).  Therefore, the Court will first address Defendants' motion to dismiss Plaintiff's claims for lack of personal jurisdiction under Rule 12(b)(2) and improper venue under Rule 12(b)(3).  Only after these threshold issues are resolved can the Court determine whether to address Defendants' non-jurisdictional motions.[4]

---

[4]    Defendants cite Federal Rule of Civil Procedure 12(b)(1) in their opening brief (Def. Br. 1), but they do not actually raise any Rule 12(b)(1) arguments.

A.      **The Court Lacks Personal Jurisdiction over Defendants**

1.      **Applicable Law**

a.      **Federal Rule of Civil Procedure 12(b)(2)**

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (citing *Robinson* v. *Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)). If a court does not conduct an evidentiary hearing on the issue of personal jurisdiction, as is the case here, "the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam) (citing *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). A plaintiff makes such a showing through "an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Robertson-Ceco*, 84 F.3d at 567 (alteration in original) (quoting *Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Plaintiff's jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)). Where a court does not hold an evidentiary hearing on the jurisdictional question, it may, nevertheless, consider matters outside the

pleadings.  *See Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).

To determine whether the exercise of personal jurisdiction over a defendant is proper, a court conducts a two-part inquiry.  *First*, a court considers whether there is a basis for personal jurisdiction under the laws of the forum state.  *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci II*").  *Second*, a court must examine whether the exercise of personal jurisdiction comports with due process protections established under the United States Constitution, as set forth in *International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945), and its progeny.  *See Licci II*, 732 F.3d at 168.  "Due process considerations require that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 169 (internal quotation marks omitted) (quoting *Int'l Shoe*, 326 U.S. at 316).  Put differently, due process is not violated when a defendant is "haled into court in a forum State based on his own affiliation with the State." *Walden* v. *Fiore*, 571 U.S. 277, 286 (2014).  Because Plaintiff is appearing *pro se*, the Court construes his submissions "liberally" and interprets them "to raise the strongest arguments that they suggest."  *Meadows* v. *United Servs., Inc.*, 963 F.3d 240, 243 (2d Cir. 2020) (quotations omitted).

### b.    Federal Rule of Civil Procedure 12(b)(3)

Challenges to personal jurisdiction sometimes include challenges to venue, and the Court therefore discusses the relevant law for both.  "The legal

standard for a motion to dismiss for improper venue [pursuant to Federal Rule of Civil Procedure 12(b)(3)] is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd.* v. *Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co.* v. *Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)). The plaintiff bears the burden but need only make a *prima facie* showing that venue is proper. *Id.* Further, the court is obligated to credit the plaintiff's factual averments as true, construe the pleadings in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor. *Id.* (citing *Robertson-Ceco Corp.*, 84 F.3d at 567; *Boehner* v. *Heise*, 410 F. Supp. 2d 228, 240 (S.D.N.Y. 2006); *Porina* v. *Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez* v. *Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 211 (2d Cir. 2014)).

## 2. Analysis

### a. The Court Lacks General Personal Jurisdiction over Defendants

Personal jurisdiction comes in two varieties: "specific (or 'case-linked') and general (or 'all-purpose')." *Keep on Kicking Music, Inc.* v. *Universal Music Publ'g Grp.*, No. 23 Civ. 4400 (JPO), 2024 WL 3675936, at *2 (S.D.N.Y. Aug. 5, 2024) (citing *Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)). New York's long-arm statute, contained in its Civil Practice Law and Rules ("C.P.L.R."), allows for general jurisdiction, "which may arise from a foreign defendant's overall course of business in the [forum] state." *See Beskrone* v. *Berlin,* 656 F. Supp. 3d 496, 506 (S.D.N.Y. 2023); N.Y. C.P.L.R. § 301.

The Supreme Court has made clear that to be subject to general jurisdiction in a particular forum state, a defendant's "affiliations with the State [must be] so 'continuous and systematic' as to render [it] essentially at home" there. *Daimler AG* v. *Bauman*, 571 U.S. 117, 119 (2014) (second alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 919 (2011)). Individual defendants are "at home" in the state in which they are domiciled — that is, the state in which they reside and intend to remain indefinitely. *Ford*, 592 U.S. at 358-59 (citing *Daimler*, 571 U.S. at 137). "And the 'equivalent' forums for a corporation are its place of incorporation and principal place of business." *Id.* at 359 (quoting *Daimler*, 571 U.S. at 137).

Plaintiff does not allege that either Defendant is domiciled in New York; Defendant Cox is a resident and domiciliary of Texas, and Defendant Go Big Solar is a Texas limited liability company with its principal place of business in Texas. (SAC ¶¶ 2-3). Therefore, the Court may not exercise general personal jurisdiction over either defendant.

### b. The Court Lacks Specific Jurisdiction over Defendants Under New York's Long-Arm Statute

#### i. Defendants Did Not "Transact[ ] Any Business" in New York

Instead, Plaintiff asks the Court to exercise specific personal jurisdiction over Defendants under C.P.L.R. § 302, which provides in relevant part:

> § 302. Personal jurisdiction by acts of non-domiciliaries.
> (a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

> 1. transacts any business within the state or contracts
> anywhere to supply goods or services in the state ….

N.Y. C.P.L.R. § 302(a)(1).  Section 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (quoting *Kreutter* v. *McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

A court may exercise personal jurisdiction over a non-domiciliary if two conditions are met: "first, the non-domiciliary must transact business within the state; second, the claims against the non-domiciliary must arise out of that business activity."  *Aquiline Cap. Partners LLC* v. *FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (internal citations and quotation marks omitted).  The Second Circuit, in turn, has articulated four factors for courts to consider when determining whether a defendant transacts business in New York via contract:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc.* v. *McDonald,* 362 F.3d 17, 22-23 (2d Cir. 2004) (quoting *Agency Rent A Car Sys., Inc.* v. *Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.

1996)).  "Although all factors are relevant, no one factor is dispositive and other factors may be considered."  *Id.* at 23.  Courts must ultimately decide "based on the totality of the circumstances."  *Id.* (quoting *Agency Rent A Car Sys.*, 98 F.3d at 29).

Two of these factors — the existence of a New York choice-of-law clause and "whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state" — are simply not present in this case.  *Sunward Elecs.*, 362 F.3d at 22.  The MOU does not contain a choice-of-law clause, and while the MOU established a profit-sharing framework, it does not detail how payments will be made.  (December 6 MOU; October 25 MOU).  Furthermore, neither party has alleged that any payments have been made to Plaintiff in New York, especially since the two deals contemplated in 2018 were not completed.  (Dkt. #1 ¶ 16; Def. Br. 1; SAC, Ex. G (referencing an invoice for a deal that was not ultimately completed)).

Accordingly, the Court analyzes whether the Defendants have "transacted business in New York" under the two remaining factors: whether (i) Defendants have "an on-going contractual relationship with a New York corporation" or (ii) "the contract was negotiated in New York[.]"  *Sunward Elecs.*, 362 F.3d at 22.  The contract at issue in this case is the 2018 MOU, and for purposes of the instant motions, the Court will consider both sides' proffered versions of the document.  (December 6 MOU; October 25 MOU).  Plaintiff alleges two types of contacts that Defendants had with New York:

(i) email correspondence regarding marketing materials and introductions made between Defendants and third parties; and (ii) two meetings Plaintiff had with Defendant Cox in New York. The Court will consider each category of contacts individually.

### (a) The Email Correspondence with Defendants Does Not Suffice to Establish Personal Jurisdiction

Seeking to demonstrate an on-going contractual relationship with a New York corporation, Plaintiff contends that he "leverag[ed] his extensive network [and] facilitated multiple introductions and opportunities for Defendants[.]" (SAC ¶ 12). In the SAC, Plaintiff cites a Zoom meeting confirmation between Defendants and the managing director of UGE International, which is allegedly based in New York. (SAC, Ex. C; Pl. First Opp., Ex. M).[5] Plaintiff also cites email communications between Defendant Cox and a director of the Puerto Rico project. (SAC, Ex. F). Plaintiff is copied on these emails, and the correspondence mentions the Smithville Project with the aforementioned UGE. (*Id*.). Separately, in his opposition to the motion to dismiss, Plaintiff submits additional emails referencing various Texas projects between Defendant Cox and third-party companies based in Texas. (Pl. First Opp., Ex. K, L). Plaintiff appears to offer these emails to show his continued involvement in Defendants' business dealings, particularly following his alleged introduction of Defendants' to UGE. According to Plaintiff, these emails refute the claim that "[Plaintiff]

---

[5]    Defendant concedes that UGE International is based in New York, and that Cox is a UGE employee, though Cox lives and works in Texas. (Def. Br. 11-12).

and Cox only worked on the Paul Quinn and Puerto Rico (San German) deals."
(*Id.*).  Neither of these emails references the Smithville Project.  (*Id.*).

"[C]orrespondence sent into New York, by a non-domiciliary defendant
who is outside New York, generally [is] insufficient to establish personal
jurisdiction."  *Int'l Customs Assocs.* v. *Ford Motor Co.*, 893 F. Supp. 1251, 1261
(S.D.N.Y. 1995) (collecting cases), *aff'd*, 201 F.3d 431 (2d Cir. 1999), *cert.
denied*, 530 U.S. 1264 (2000).  Instead, "communications into New York will
only be sufficient to establish personal jurisdiction if they were related to some
transaction that had its center of gravity inside New York, into which a
defendant projected himself."  *Maranga* v. *Vira*, 386 F. Supp. 2d 299, 306
(S.D.N.Y. 2005) (internal quotation marks omitted).  In this case, the centers of
gravity for Defendants' transactions are Texas and Puerto Rico, not New York.
Courts in this District have found personal jurisdiction lacking where the only
communications with New York relate to transactions taking place outside of
New York.  *See, e.g.*, *Sandoval* v. *Abaco Club on Winding Bay*, 507 F. Supp. 2d
312, 317 (S.D.N.Y. 2007) (finding no personal jurisdiction where the parties
negotiated via communications to New York regarding a contract that would
take place in the Bahamas); *Digit. Lab Sols., LLC* v. *Stickler*, No. 06 Civ. 6482
(LLS), 2007 WL 700821, at *4 (S.D.N.Y. Mar. 7, 2007) (finding no personal
jurisdiction where the "purpose of defendants' e-mails was not actively to
participate in business in New York, but rather to create a new business in
California"); *Premier Lending Serv.* v. *J.L.J. Assocs.*, 924 F. Supp. 13, 16
(S.D.N.Y. 1996) (finding that the defendants' mail, phone, and fax contacts with

16

New York concerning a New Jersey mortgage were insufficient to create jurisdiction in New York).

Plaintiff claims that the parties had been conducting business in New York since 2016, when the NDA was signed. (SAC ¶ 6). However, the 2018 MOU between Iconoclast Advisors and Go Big Solar listed only two deals, one in Texas and one in Puerto Rico. (October 25 MOU). Both Plaintiff and Defendants admit that neither of these deals was completed by 2019 or 2020. (Def. Br. 1; Dkt. #1 ¶ 16). Since these deals were never finished, they cannot be considered part of an "on-going relationship" for purposes of C.P.L.R. § 302. *Cf. Digit. Lab Sols.*, 2007 WL 700821, at *3 (finding that a company that never did business was not part of an on-going relationship).

To be sure, the MOU states that "future deals can be added as needed," which could support the existence of an "on-going contractual relationship." (December 6 MOU; October 25 MOU). Regardless, the Second Circuit has found that the first *Sunward* factor "weighs only weakly towards finding personal jurisdiction" where, as here, the relationship concerns the "distribution of … products in a foreign market rather than distribution of those products in New York." *Cont'l Indus. Grp.* v. *Equate Petrochemical Co.*, 586 F. App'x 768, 770 (2d Cir. 2014) (summary order). Even if Plaintiff and Defendants have had some sort of relationship since 2016, all communications pertain to transactions occurring outside New York. Therefore, Defendants have not directed their conduct to New York with the intent of "invoking the benefits and protections of [New York's] laws." *Licci ex rel. Licci* v. *Lebanese*

17

*Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) ("*Licci I*") (quoting

*Fischbarg* v. *Doucet*, 9 N.Y.3d 375, 380 (2007)).

>            **(b)**    **The Meetings in New York Do Not Suffice to
>                      Establish Personal Jurisdiction**

Plaintiff fares no better with his second argument. He alleges that

Defendant Cox visited New York twice, once in 2016 to sign the NDA, and once

in December 2018 to "reaffirm[ ]" the terms of the 2016 NDA and "outline[ ]"

the division of fees and profits in the MOU. (SAC ¶¶ 6, 9-10). The exhibits

submitted in connection with Defendants' motion to dismiss establish that the

December 6, 2018 MOU allegedly signed by Plaintiff and Defendant Cox was

primarily negotiated over email in October 2018. (Cox Decl., Ex. A). The only

difference between the October agreement negotiated over email and the

December agreement signed in New York is the addition of the clause

referencing the Smithville Project, which (as discussed *infra*, Section C.2.b) was

added to the contract unilaterally by Plaintiff in 2024.

In general, courts are "skeptical of attempts to assert personal

jurisdiction over a defendant based on a single meeting in New York, especially

where that meeting did not play a significant role in establishing or

substantially furthering the relationship of the parties." *Shelbourne Glob. Sols.,

LLC* v. *Gutnicki LLP*, 658 F. Supp. 3d 104, 116 (E.D.N.Y. 2023) (quoting *Gordian

Grp., LLC* v. *Syringa Expl. Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016)); *cf.

Hoffritz for Cutlery, Inc.* v. *Amajac, Ltd.*, 763 F.2d 55, 57, 59-60 (2d Cir. 1985)

(finding personal jurisdiction where the defendants visited New York more than

fifty times to negotiate key contract terms over ten years).

"Under New York law, the transacts-business standard can be satisfied where both the negotiations and execution of a contract took place within New York." *Grand River Enters. Six Nations, Ltd.* v. *Pryor*, 425 F.3d 158, 166-67 (2d Cir. 2005) (citing *George Reiner & Co.* v. *Schwartz*, 41 N.Y.2d 648, 652-53 (1977)).  Contracts signed by defendants in New York are generally given more weight than contracts signed outside New York.  *See Hoffritz for Cutlery, Inc.*, 763 F.2d at 60.  However, "physical presence alone cannot talismanically transform any and all business dealings into business transactions under [C.P.L.R. § 302]." *Presidential Realty Corp.* v. *Michael Square West, Ltd.*, 44 N.Y.2d 672, 673-74 (1978) (finding no personal jurisdiction where a modification letter and agreement were signed in New York, but the agreement was negotiated elsewhere); *see also Abbate* v. *Abbate*,  441 N.Y.S.2d 506, 515 (2d Dep't 1981) (noting that, while "one 'purposeful' act in this State is enough to serve as the basis for the exercise of long-arm jurisdiction over the nondomiciliary defendant," where that "act is purely ministerial, as where the parties reach full agreement on a contract in their respective home states and merely execute the formal document memorializing their agreement in New York, it is doubtful that jurisdiction would be sustained" (internal citations omitted)); *Palmer* v. *Globalive Commc'ns Corp.*, No. 07 Civ. 38 (MGC), 2008 WL 2971469, at *6-7 (S.D.N.Y. Aug. 1, 2008) (surveying New York cases and finding that there can be personal jurisdiction over defendants where "the meeting in New York substantially advanced the parties' relationship or was essential to the formation of the … contract").

19

The exhibits to Plaintiff's SAC indicate that a version of the 2018 MOU was signed in New York in 2018.  (*See* December 6 MOU; SAC, Ex. B).[6]  The terms of the October 25 MOU and the December 6 MOU are substantially the same, with the exception of the clause added unilaterally by Plaintiff in 2024.  (October 25 MOU; December 6 MOU).  All parties agree the MOU was negotiated outside New York, and even assuming it was signed in New York, the Court considers this case to be more like *Presidential Realty Corp.*, where the Court of Appeals found no personal jurisdiction over the defendants.  44 N.Y.2d at 673-74.  Here, "[a]s with … *Presidential Realty*, the signing of the [MOU] in New York was merely coincidental or fortuitous, not a purposeful availment sufficient to confer jurisdiction under [C.P.L.R. § 302.]"  *Palmer*, 2008 WL 2971469, at *8.

Furthermore, "plaintiffs typically cannot establish personal jurisdiction through their unilateral decisions about where to execute agreements with out-of-state defendants."  *Narang* v. *Armour*, No. 24 Civ. 1125 (JPO), 2025 WL 1569644, at *8 (S.D.N.Y. June 3, 2025) (citing *PaineWebber Inc.* v. *WHV Inc.*, No. 95 Civ. 52 (LMM), 1995 WL 296398, at *3-4 (S.D.N.Y. May 16, 1995)).  Thus, the Smithville Project unilaterally added by Plaintiff to the December 6 MOU does not create a contact with New York.  Plaintiff does not allege that Cox traveled to New York to conduct business with Plaintiff after the 2018 MOU was signed.  Therefore, although the MOU may have been signed in New

---

[6]    Defendants maintain that the MOU was signed and executed over email.  (Def. Br. 1).

York, the contract negotiations occurred outside New York, and Cox did not visit New York to further the business relationship after 2018.  As a result, Defendants' presence in New York is insufficient to establish that they transacted business there.

> **ii.    Plaintiff's Causes of Action Do Not "Aris[e] From" Transactions Within New York**

Even if Defendants had transacted business within New York for purposes of C.P.L.R. § 302, Plaintiff fails to allege that his causes of action arise from these transactions.  *Aquiline Cap. Partners LLC*, 861 F. Supp. 2d at 386.  A cause of action arises from a defendant's conduct when there exists an "articulable nexus" or a "substantial relationship" between transactions occurring within New York and the cause of action sued upon.  *Sunward Elecs.*, 362 F.3d at 23 (quoting *Kronisch* v. *United States*, 150 F.3d 112, 130 (2d Cir. 1998)).  "[W]hether a plaintiff's claim arises from a defendant's New York contacts depends upon the nature and elements of the particular causes of action pleaded."  *Licci II*, 732 F.3d at 169 (internal quotation marks omitted).  There is "no bright-line test for determining whether the 'nexus' is present in a particular case."  *Licci I*, 673 F.3d at 67.  Rather, the "inquiry is a fact-specific one[.]"  *Id.* (quoting *Sole Resort, S.A. de C.V.* v. *Allure Resorts Mgt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).  Cases that have been dismissed for lack of this nexus arose from events that had "at best[] a tangential relationship to any contacts the defendant had with New York."  *Id.*

In this case, Plaintiff brings claims of breach of contract, unjust enrichment, and tortious interference against Defendants related to the Smithville Project.  The Court addresses each in turn.

### (a)    Breach of Contract

"Two elements give rise to a breach of contract claim: (i) a contract between the parties and (ii) an act allegedly in violation of that agreement. Both are necessary elements of the claim; neither is sufficient by itself." *Agency Rent a Car*, 98 F.3d at 31.  "[W]hether such a claim arises out of the defendant's transaction of business turns on the relationship between that transaction and the contract itself as much as between the transaction and the breach." *Three Five Compounds, Inc.* v. *Scram Techs., Inc.*, No. 11 Civ. 1616 (RJH), 2011 WL 5838697, at *5 (S.D.N.Y. Nov. 21, 2011) (citing *Agency Rent a Car*, 98 F.3d at 31).

Plaintiff unilaterally added the Smithville deal to the MOU six years after the contract was signed in New York, so the breach of contract claim does not (and indeed could not) arise from Defendants' contacts with New York. (December 6 MOU; Cox Decl., Ex. D).  Furthermore, even if the email correspondence established that the parties had discussed the Smithville Project (which, it bears emphasizing, is a Texas project that is, at best, tangentially connected to New York via UGE International), emails to Plaintiff in New York are insufficient on their own to establish requisite contacts with New York.  *See Int'l Customs Assocs.*, 893 F. Supp. at 1261.  Thus, Plaintiff's breach of contract claim does not share an "articulable nexus" or "substantial

relationship" with Defendants' contacts with New York. *Sunward Elecs.*, 362 F.3d at 23.

**(b)     Unjust Enrichment**

Unjust enrichment requires "[i] that the defendant benefitted; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution." *Myun-Uk Choi* v. *Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye* v. *Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)). Plaintiff claims that Defendants "unjustly benefited from years of Plaintiff's services," and requests that the Court "disgorge all profits derived from the Smithville [P]roject." (SAC 4). However, as discussed above, all evidence of communications provided by the Plaintiff and Defendants regarding the Smithville Project took place over email, which is insufficient to establish a connection to New York. (SAC, Ex. F, G). *See Int'l Customs Assocs.*, 893 F. Supp. at 1261. Furthermore, the Smithville Project relates to a deal in Texas; as a result, Plaintiff cannot show that any unjust enrichment claim related to that deal arises out of business that Defendants transacted in New York. That UGE International is a New York company is insufficient. *See Jian Tam* v. *MIH CP Sols., LLC*, No. 21 Civ. 2148 (RPK), 2022 WL 17415088, at *1, 4 (E.D.N.Y. Dec. 5, 2022) (finding that the defendant did not undertake activity in New York to unjustly enrich himself where the defendant was the vice-president of a company that was a member of a joint venture that provided equipment to New York).

23

### (c)    Tortious Interference

Plaintiff's tortious interference claim arises from the same facts underlying his breach of contract and unjust enrichment claims. (SAC ¶¶ 25-28). To state a claim for tortious interference with a contract, a plaintiff must prove: "[i] the existence of a valid contract between the plaintiff and a third party; [ii] the defendant's knowledge of the contract; [iii] the defendant's intentional procurement of the third-party's breach of the contract without justification; [iv] actual breach of the contract; and [v] damages resulting therefrom." *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).

Here, Plaintiff claims that Defendants "interfered with [his] relationship [with UGE] by circumventing Plaintiff and engaging directly with UGE through a third party." (SAC ¶ 27). Plaintiff claims he had an "introductory" Zoom meeting with Cox and a representative from UGE. (*Id.*, Ex. C). Plaintiff also alleges that Cox now works for UGE. (Pl. First Opp. 4). However, Plaintiff has not provided enough facts to prove the existence of a contract between UGE International and Plaintiff. Therefore (as the Court discusses in more detail *infra*, Section C.2.d), Plaintiff does not have a valid claim of tortious interference, and certainly not one that arises out of his contacts with New York. Furthermore, even if Defendant Cox were currently working for UGE in his individual capacity, this does not affect the MOU between Go Big Solar and Iconoclast Advisors, which outlines a profit-sharing arrangement between the

parties for two deals with companies other than UGE. (October 25 MOU; December 6 MOU). Thus, the tortious interference claim does not share any nexus or substantial relationship with the contacts related to business transacted in New York.

In sum, the Court finds that none of the three claims Plaintiff alleges falls within the reach of New York's long-arm statute.

c.    **The Court's Exercise of Personal Jurisdiction over Defendants Would Not Comport with Due Process Under the Constitution**

Generally, where there is no statutory basis for personal jurisdiction under New York law, "the Court need not reach the question of whether the exercise of jurisdiction comports with due process." *Edwardo* v. *Roman Cath. Bishop of Providence,* 579 F. Supp. 3d 456, 476 (S.D.N.Y. 2022) (quoting *Trodale Holdings LLC* v. *Bristol Healthcare Invs., L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *10 (S.D.N.Y. Nov. 29, 2017)) (citing *NuMSP, LLC* v. *St. Etienne*, 462 F. Supp. 3d 330, 354 (S.D.N.Y. 2020)), *aff'd*, 66 F.4th 69 (2d Cir. 2023); *see also Donner* v. *DER SPIEGEL Gmbh & Co. KG*, 747 F. Supp. 3d 681, 688 (S.D.N.Y. 2024) ("If New York law does not permit the Court to exercise personal jurisdiction over the non-domiciliary defendants, then the Court need not determine whether jurisdiction would be permissible under the United States Constitution" (citing *Licci I*, 673 F.3d at 60-61; *Penguin Grp. (USA) Inc.* v. *Buddha,* 609 F.3d 30, 35-36 (2d Cir. 2010)).

### d.    The Court Need Not Reach the Motion to Dismiss for Improper Venue

Defendants also move to dismiss the action for improper venue pursuant to Fed. R. Civ. P. 12(b)(3).  A plaintiff bears the burden of showing that venue is proper once an objection is raised.  *PI, Inc.* v. *Quality Prods., Inc.*, 907 F. Supp. 752, 757 (S.D.N.Y. 1995) (citing *Reina* v. *Morgan Drive Away Inc.*, No. 94 Civ. 6495 (LLS), 1995 WL 66585, at *1 (S.D.N.Y. Feb 15, 1995)).  However, since the Court has determined that there is no personal jurisdiction over Defendants in this forum, "this Court need not reach [Defendants'] motion to dismiss on the alternative ground of improper venue."  *Donner*, 747 F. Supp. 3d at 694 (citing *Kaplan Group. Invs. LLC* v. *A.S.A.P. Logistics Ltd.*, 694 F. Supp. 3d 374, 385 (S.D.N.Y. 2023) (declining to reach the issue of improper venue where the court found that personal jurisdiction was lacking)).

## B.    The Court Will Not Dismiss the SAC for Failure to Join an Indispensable Party

Because the Court has determined that it lacks personal jurisdiction, it would not ordinarily consider Defendants' non-jurisdictional arguments for dismissal.  *Cf. Oliveras* v. *United States*, 371 F. Supp. 3d 105, 113-14 (S.D.N.Y. 2019) (citing, in case finding a lack of subject matter jurisdiction, *Cornwell* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385-86 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further.")).  However, given Plaintiff's *pro se* status and the fact that the personal jurisdictional issues just discussed are "complex," *see Carr* v. *DeVos*, 369 F. Supp. 3d 554, 562 (S.D.N.Y. 2019), the Court chooses to

26

consider Defendants' remaining arguments for dismissal in the interest of
"efficiency," *id.*

### 1.    Applicable Law

As noted, Defendants also seek dismissal on the grounds that Plaintiff
has failed to join an indispensable party, namely, Iconoclast Advisors.  Federal
Rule of Civil Procedure 12(b)(7) provides that an action may be dismissed for
failure to join a party under Federal Rule of Civil Procedure 19.  *See* Fed. R.
Civ. P. 12(b)(7).

Rule 19 sets forth a two-part test for courts to use in determining
whether an action must be dismissed for failure to join an indispensable party.
*Viacom Int'l, Inc.* v. *Kearney*, 212 F.3d 721, 724 (2d Cir. 2000).  The first
question is whether the party is necessary.  Rule 19(a) provides that the absent
party shall be joined in the suit, if feasible, where:

> (1) in that person's absence, the court cannot accord
> complete relief among existing parties; or (2) that person
> claims an interest relating to the subject of the action
> and is so situated disposing of the action in the person's
> absence may (i) as a practical matter impair or impede
> the person's ability to protect the interest or (ii) leave an
> existing party subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations
> because of the interest.

Fed. R. Civ. P. 19(a).  If the party is not necessary under Rule 19(a), then the
Court need not decide whether its absence warrants dismissal under Rule
19(b).  *Viacom Int'l, Inc.*, 212 F.3d at 724 (citing *Associated Dry Goods Corp.* v.
*Towers Fin. Corp.*, 920 F.2d 1121, 1123 (2d Cir. 1990)).  Conversely, if the
court finds that the party is necessary, it should then go on to consider

27

whether the party is indispensable, using the equitable factors outlined in Rule 19(b). *See Associated Dry Goods Corp.*, 920 F.2d at 1123-24; *Yusin Brake Corp.* v. *Motorcar Parts of Am., Inc.*, No. 13 Civ. 9223 (DLC), 2014 WL 2560612, at *11 (S.D.N.Y. June 6, 2014) (citing *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 131-32 (2d Cir. 2013)).

It is well established that a party to a contract that is the subject of the litigation is considered a necessary party. *See, e.g.*, *Glob. Discount Travel Servs., LLC* v. *Trans World Airlines, Inc.*, 960 F. Supp. 701, 707-08 (S.D.N.Y. 1997) ("As a direct party to the contract which is under dispute, [the non-party] is a necessary party to this litigation for at least three reasons articulated under Fed. R. Civ. P. 19(a)."); *Kawahara Enters.* v. *Mitsubishi Elec. Corp.*, No. 96 Civ. 9631 (MBM), 1997 WL 589011, at *3 (S.D.N.Y. Sept. 22, 1997) (finding that parties to a contract were necessary parties to a breach of contract action); *Travelers Indem. Co.* v. *Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991) ("[P]recedent supports the proposition that a contracting party is the paradigm of an indispensable party." (citing *Cloverleaf Standardbred Owners Ass'n, Inc.* v. *Nat'l Bank of Washington*, 699 F.2d 1274, 1279-80 (D.C. Cir. 1983))). Here, because it is a direct party to the 2018 MOU, Iconoclast Advisors is a necessary party. (October 25 MOU; December 6 MOU).

If a party is found to be necessary, the court must then determine whether the party's absence warrants dismissal pursuant to Rule 19(b). *Viacom*, 212 F.3d at 725. Rule 19(b) specifies the factors a court must assess when determining whether "in equity and good conscious, the action should

28

proceed among the existing parties or should be dismissed."  Fed. R. Civ. P.

19(b).  These factors include:

> [i] the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; [ii] the extent to which any prejudice could be lessened or avoided ... ; [iii] whether a judgment rendered in the person's absence would be adequate; and [iv] whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.*

The Second Circuit has opined that it would be error to "adopt[ ] a bright-line rule that all parties to a contract are indispensable."  *CP Sols. PTE, Ltd.* v. *Gen. Elec. Co.* 553 F.3d 156, 159 (2d Cir. 2009) (per curiam).  Rather, in assessing the Rule 19(b) factors, courts must employ a "flexible approach," *Universal Reins. Co.* v. *St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002) (citing *Jaser* v. *N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987)), and their analysis is "case-specific," *Republic of Philippines* v. *Pimentel*, 553 U.S. 851, 864 (2008).  "District courts are afforded substantial discretion in weighing the Rule 19(b) factors and in determining how heavily to emphasize certain considerations in deciding whether the action should go forward in the absence of someone needed for a complete adjudication of the dispute."  *Walker* v. *City of Waterbury*, 253 F. App'x 58, 62 (2d Cir. 2007) (summary order) (internal quotation marks omitted).  Accordingly, "[t]he decision whether to dismiss an action for failure to join an indispensable party

29

is ... more in the arena of a factual determination than a legal one." *Id.*
(internal quotation marks omitted).

### 2.    Analysis

"The first two factors under Rule 19(b) require this Court to consider
whether any prejudice would result to [the non-joined party] or any other
defendant as a result of [the non-joined party's] dismissal, and if so, the extent
to which such prejudice can be alleviated." *Walpert* v. *Jaffrey*, 127 F. Supp. 3d
105, 120 (S.D.N.Y. 2015). Since the non-joined party in this case is the LLC
Plaintiff solely owns (Dkt. #1 ¶ 1 (stating that Iconoclast Advisors is a single-
member LLC owned by Plaintiff)), and Plaintiff voluntarily dropped Iconoclast
Advisors from this action by amending his complaint (*see* SAC), "[w]hatever
prejudice to [Iconoclast Advisors] there might be, it is prejudice the plaintiff is
willing to bear and therefore should not ... trouble[ ] the district court." *CP
Sols.*, 553 F.3d at 159.

Moreover, the degree of any prejudice to Iconoclast Advisors is small
because Plaintiff, though not a party to the MOU, is an intended third-party
beneficiary of it. Third-party beneficiaries have standing under New York law
to enforce a contract. *Toretto* v. *Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464,
476-77 (S.D.N.Y. 2021). Plaintiff has adequately pleaded that he is an intended
third-party beneficiary of the MOU because he has alleged that Iconoclast
Advisors is a single-member LLC owned by him (Dkt. #1 ¶ 1), and he refers to
himself when discussing the benefits that Iconoclast Advisors would receive
under the MOU (SAC ¶¶ 9-14). Thus, the terms of the MOU "*clearly evince* an

intention to benefit the third person [(Plaintiff)] who seeks the protection of the contractual provisions." *Veleron Holding, B.V.* v. *BNP Paribas SA*, No. 12 Civ. 5966 (CM), 2014 WL 12699263, at *20 (S.D.N.Y. Apr. 16, 2014) (internal quotation marks omitted); *cf. DM Manager LLC* v. *Fid. Nat'l Info. Servs., Inc.*, No. 23 Civ. 617 (ER), 2024 WL 1347724, at *16 (S.D.N.Y. Mar. 29, 2024) (finding that plaintiff did not have standing to enforce contract as an intended third-party beneficiary where the complaint failed to allege what contributions the non-contracting plaintiffs made), *aff'd*, No. 24-1217, 2025 WL 863338 (2d Cir. Mar. 19, 2025) (summary order).  The Court finds no prejudice where Plaintiff is effectively standing in the shoes of the non-joined party.

As for the third Rule 19(b) factor, "adequacy refers to the public stake in settling disputes by wholes, whenever possible," or, in other words, "the social interest in the efficient administration of justice and the avoidance of multiple litigation." *Walpert*, 127 F. Supp. 3d at 121 (internal quotation marks and citations omitted).  Here, "[i]t would make little sense to require [the parties] to start over in state court simply because" Plaintiff voluntarily dropped the LLC from this action in order to abide by settled precedent that corporations cannot proceed *pro se* in federal court.  *CP Sols.*, 553 F.3d at 160; *see Grace* v. *Bank Leumi Trust Co. of NY*, 443 F.3d 180, 192 (2d Cir. 2006) ("[I]t is settled law that a corporation may not appear in a lawsuit except through an attorney[.]").

Finally, as for the fourth factor, Plaintiff might not be deprived of an adequate remedy if the action were dismissed for failure to join an indispensable party and refiled in state court via the LLC (represented by

31

counsel or not).  However, "the bare fact that a state court forum is available does not, by itself, make it appropriate to dismiss a federal action." *Walpert*, 127 F. Supp. 3d at 121 (internal quotation marks and citations omitted).  Here, the prospect of a state court remedy "is far outweighed by the unfairness to [Plaintiff] and the harm to judicial economy resulting from dismissal." *CP Sols.*, 553 F.3d at 161.  Therefore, the Court finds that Iconoclast Advisors is not an indispensable party under Rule 19(b), and thus finds no basis for dismissal under Rule 12(b)(7).

**C.    The SAC Fails to State a Claim Upon Which Relief Can Be Granted**

   **1.    Applicable Law**

Given the complexity of the personal jurisdiction issues, the possibility that a reviewing court might resolve those issues differently, Plaintiff's *pro se* status, and the Court's interest in conserving judicial and party resources, the Court will also consider the merits of Plaintiff's claims for relief.  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not

require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

As noted, "courts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (further citation omitted)). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (internal quotation marks and alterations omitted) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413 (2d Cir. 1999)). "That said, the liberal pleading standard accorded to *pro se* litigants is not without limits, and all normal rules of pleading are not absolutely suspended." *Hill* v. *City of New York*, No. 13 Civ. 8901 (KPF), 2015 WL 246359, at *2 (S.D.N.Y. Jan. 20, 2015) (internal quotation marks and citation omitted). To survive a Rule 12(b)(6) motion to dismiss, a *pro se* plaintiff's factual allegations still must at least "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And even in the *pro se* context, a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).

33

On a motion to dismiss, "the Court may consider any written instrument attached to the [c]omplaint as an exhibit, any statements or documents incorporated by reference in the [c]omplaint, documents that are 'integral' to the [c]omplaint even if they are not incorporated by reference, and matters of which judicial notice may be taken." *Donoghue* v. *Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *2 (S.D.N.Y. Aug. 8, 2022) (citing *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)), *aff'd*, No. 24-2321-cv, 2025 WL 1922469, at *1 (2d Cir. July 14, 2025) (summary order); *see also* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part of the pleading for all purposes."). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers*, 282 F.3d at 153 (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (citing *Kaempe* v. *Meyers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alt. Energy, Inc.* v. *St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.*

### 2.    Analysis

The Court begins its Rule 12(b)(6) analysis by clarifying what is, and is not, incorporated by reference in, or integral to, the SAC.  Since Plaintiff has attached supplemental documents as exhibits to the SAC, the Court may consider the facts proffered in these documents.  (SAC, Ex. A-G).  *See DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers*, 282 F.3d at 152-53).  The SAC explicitly refers to the December 6 MOU, which is also attached to the SAC as an exhibit.  (SAC ¶¶ 9-11; *id.*, Ex. A). Furthermore, the Court may consider additional exhibits Plaintiff included in his opposition papers.  (Pl. First Opp.).  *See Adeniji* v. *N.Y. State Off. of State Comptroller*, No. 18 Civ. 761 (PAE) (BCM), 2019 WL 4171033, at *2-3 (S.D.N.Y. Sept. 3, 2019) ("[F]actual allegations made in a *pro* se plaintiff's opposition papers, or the attachments thereto, may be considered 'as supplementing the Complaint, at least to the extent they are consistent with the allegations in the Complaint.'" (quoting *George* v. *Pathways to Hous., Inc.*, No. 10 Civ. 9505 (ER), 2012 WL 2512964, at *6 n.7 (S.D.N.Y. June 29, 2012))).

In this case, Defendants seek to introduce a number of exhibits, attached to the Cox Declaration, in support of their motion to dismiss.  (Cox Decl., Ex. A-F).  One of these documents is the October 25 MOU, which, to reiterate, is exactly the same as the version of the December 6 MOU submitted by Plaintiff except for font changes and the addition of the Smithville Project. (*Compare* October 25 MOU, *with* December 6 MOU).  While Plaintiff does not explicitly incorporate the October 25 MOU into his pleadings, he repeatedly

acknowledges that the December 6 MOU that he submitted to the Court was an "amended" version of the original MOU he had signed. (*See* SAC, Ex. A (stating that "[t]he Smithville project is included under its terms in Addendum A, which details specific profit-sharing agreements and amendments"); Pl. First Opp. 4 (referring to Plaintiff's claim as a breach of the "MOU & Amended MOU"); *id.*, Ex. L (referring to the December 6 MOU as the "amended MOU")). In a similar vein, Plaintiff states in his first opposition submission that "the MOU does not prohibit amendments nor say that they must be mutually signed off on," and that "Plaintiff drafted the MOU specifically to include additional transactions." (Pl. First Opp. 5). Therefore, Plaintiff relies on the content of the October 25 MOU to support his argument that he can unilaterally include the Smithville Project in the December 6 MOU. As such, the October 25 MOU is the operative MOU in this case and forms the basis of Plaintiff's contract and quasi-contract claims.[7]

Plaintiff's complaint effectively "stands or falls" on the December 6 MOU, to which the October 25 MOU is an essential precursor. *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157. And since Plaintiff cannot credibly dispute the "authenticity" or "relevance" of the content of October 25 MOU, the Court finds that it can consider the content of the October 25 MOU at this stage. *See*

---

[7]    The Court acknowledges the possibility that when Plaintiff references the "MOU & Amended MOU" (*see* Pl. First Opp. 4), he is in fact referring to two versions of the December 6 MOU, which would be identical except for the addition of the Smithville Project. If that were the case, however, the Court's analysis would not change, inasmuch as the content of the pre-amendment December 6 MOU would be identical to that of the October 25 MOU on which the Court relies in resolving Plaintiff's contract and quasi-contract claims.

*Id.* at 157 (noting that a court's consideration of integral materials "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting" (internal citations omitted)); *Faulkner*, 463 F.3d at 134. Therefore, the Court considers the October 25 MOU as "integral to the complaint" as it is the operative contract that Plaintiff relies on to support his assertion that he can unilaterally add the Smithville Project to the contract. *See Chambers*, 282 F.3d at 153 (citing *Int'l Audiotext*, 63 F.3d at 72).

To review, Plaintiff brings claims of breach of contract, unjust enrichment, and tortious interference with a contract. (SAC ¶¶ 20-31). At this stage, the Court will consider the pleadings and documents it has deemed incorporated by reference in, or integral to, the SAC, according to the liberal pleading standards afforded *pro se* plaintiffs, while recognizing that allegations must still "raise a right to relief above the speculative level." *Hill*, 2015 WL 246359 at *2; *see generally Twombly*, 550 U.S. at 555. The Court analyzes each claim in turn.

### a. Plaintiff Does Not Plausibly Allege Breach of Contract Against Cox in His Personal Capacity Because Plaintiff Cannot Pierce the Corporate Veil

Plaintiff attempts to pierce the corporate veil and hold Defendant Cox personally liable as the "alter ego" of Go Big Solar. (Pl. First Opp. 1). Go Big Solar, not Cox, is party to the MOU. (October 25 MOU; December 6 MOU). "New York law permits a plaintiff to 'pierce the corporate veil' and sue a non-signatory for breach of contract when the non-party is an alter ego of one or more signatories." *Mirage Entm't, Inc.* v. *FEG Entretenimientos S.A.*, 326 F.

Supp. 3d 26, 34 (S.D.N.Y. 2018) (quoting *Javier* v. *Beck*, No. 13 Civ. 2926 (WHP), 2014 WL 3058456, at *9 (S.D.N.Y. July 3, 2014)).  "[A] court may pierce the corporate veil where (i) the owner exercised complete domination over the corporation with respect to the transaction at issue, and (ii) such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Boroditskiy* v. *Eur. Specialties LLC*, 314 F. Supp. 3d 487, 494 (S.D.N.Y. 2018) (internal quotation marks omitted).

"[W]hether the alleged alter-ego entity exercised complete domination ... is highly case-specific and [depends on] ... the totality of the facts." *LiquidX Inc.* v. *Brooklawn Cap., LLC*, 254 F. Supp. 3d 609, 617 (S.D.N.Y. 2017) (internal quotation marks omitted).  In this case, Plaintiff does not sufficiently allege that Cox exercised "complete domination."  Plaintiff only states, in a conclusory fashion, that "[b]y information and belief, Go Big Solar failed to maintain separate finances, making Cox personally liable." (Pl. First Opp. 5-6).  Such an assertion is insufficient as a matter of law.

Plaintiff also fails to satisfy the fraud prong.  Specifically, Plaintiff does not allege that Cox "abused the privilege of doing business in the corporate form." *Morris* v. *N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142 (1993). "[D]omination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the] plaintiff is required." *Id.* at 141-42.  Finally, the wrongful or unjust act "must consist of more than merely the ... breach of contract that is the basis of the [party's] lawsuit." *TradeWinds Airlines, Inc.* v. *Soros*, Nos. 08 Civ. 5901 (JFK) & 10 Civ. 8175 (JFK), 2012 WL 983575, at *6

(S.D.N.Y. Mar. 22, 2012) (quoting *NetJets Aviation, Inc.* v. *LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008)).  Once again, Plaintiff conclusorily alleges that "Cox commingled personal and [Go Big Solar] funds."  (Pl. First Opp. 5-6).  That, too, is insufficient to state a breach of contract claim against Cox in his personal capacity.

### b.    Plaintiff Does Not Plausibly Allege Breach of Contract Because the Contract Lacks Mutual Assent

To state a claim for breach of contract under New York law, a plaintiff must allege four elements: "[i] the existence of a contract, [ii] performance of the contract by the plaintiff, [iii] breach by the defendant, and [iv] damages suffered as a result of the breach."  *Ebomwonyi* v. *Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022) (summary order).  Plaintiff argues that the version of the 2018 MOU dated December 6, 2018, is a valid contract that gives rise to his breach of contract claim.  As noted previously, the Court considers the October 25 MOU, which does not include the Smithville Project clause, to be the operative MOU.[8]  Accordingly, the Court will first determine whether the MOU allowed for Plaintiff's unilateral contract modification, and, if so, whether that modification is enforceable.

In interpreting a contract, the Court's primary objective "is to give effect to the intent of the parties as revealed by the language of their agreement."

---

[8]    Also as noted previously, the Court's analysis would be the same if the operative MOU were found to be the pre-amendment December 6 MOU that did not contain references to the Smithville Project.

*Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000) (citing *Sayers* v. *Rochester Tel. Corp. Suppl. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Chesapeake Energy Corp.* v. *Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks, citation, and alterations omitted). "When analyzing the meaning of a contractual provision, a threshold question the Court [must] address is whether the contract is ambiguous." *U.S. Bank, N.A.* v. *Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507 (AJN), 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017).

"[A] breach of contract claim will be dismissed where a plaintiff fails to allege the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated." *Generation Next Fashions Ltd.* v. *JP Morgan Chase Bank, NA*, 698 F. Supp. 3d 663, 673 (S.D.N.Y. 2023) (internal quotation marks omitted) (quoting *Fink* v. *Time Warner Cable*, 810 F. Supp. 2d 633, 644-45 (S.D.N.Y. 2011)). "Although the omission of essential terms, or inclusion of terms that are too indefinite, will render a contract unenforceable, the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to have legal efficacy." *Morelli* v. *Alters*, No. 19 Civ. 10707 (GHW), 2020 WL 1285513, at *9 (S.D.N.Y. Mar. 18, 2020) (internal quotation marks omitted); *see also Herman* v. *Duncan*, No. 17 Civ. 3325 (PGG), 2019 WL 2137335, at *6 (S.D.N.Y.

May 16, 2019) (citing *Kolchins* v. *Evolution Mkts., Inc.*, 8 N.Y.S.3d 1, 10-11 (1st

Dep't 2015) (citing *Cobble Hill Nursing Home, Inc.* v. *Henry & Warren Corp.*, 74

N.Y.2d 475, 483 (1989))).  Still, essential terms "should not be missing

altogether." *Herman*, 2019 WL 2137335, at *9 (citing *Rule* v. *Brine, Inc.*, 85

F.3d 1002, 1010 (2d Cir. 1996) (citing *Joseph Martin, Jr., Delicatessen, Inc.* v.

*Schumacher*, 52 N.Y.2d 105, 109 (1981))).  "[U]nder New York law, a term is

essential if it seriously affects the rights and obligations of the parties." *Morelli*,

2020 WL 1285513, at *9 (internal quotation marks omitted).

Here, the MOU contains a clause that states: "[a]n Addendum A will list

all deals currently contemplated by the two parties and future deals can be

added as needed." (October 25 MOU; December 6 MOU).  Plaintiff contends

that this clause allows him to unilaterally amend the contract to include the

Smithville Project.  (Pl. First Opp. 5).  It does not.  Although Clause Four clearly

allows for additional deals, it does not state that amendments can be made

unilaterally.  (*Cf.* October 25 MOU; December 6 MOU).  Generally, "parties

cannot unilaterally add terms to a contract after the other party has already

signed the agreement." *BNP Paribas* v. *Kurt Orban Partners LLC*, No. 19 Civ.

9616 (ALC), 2020 WL 4432302, at *3 (S.D.N.Y. July 31, 2020) (citing *Mount*

*Vernon City Sch. Dist.* v. *Nova Cas. Co.*, 19 N.Y.3d 28, 35 (2012)).  Thus,

unilateral modification "seriously affects the rights and obligations of the

parties," *Morelli*, 2020 WL 1285513, at *9, such that the failure to include a

clause allowing unilateral modification amounts to the omission of an essential

term, which the Court cannot read into the contract.

41

The MOU unambiguously does *not* state that Plaintiff can unilaterally amend the contract. To the contrary, Clause Four states that "Addendum A will list all deals currently contemplated by the *two parties*," which implies that both parties need to agree to any amendment. (October 25 MOU (emphasis added); December 6 MOU (emphasis added)). Furthermore, Clause Three outlines profit sharing and states that "[o]ther [profit sharing] options may be proposed by parties," providing further support for the Court's reading because Plaintiff cannot unilaterally add a deal that requires payment from Defendants. (October 25 MOU; December 6 MOU). The Court finds that the term "as needed" is not specific enough to imply that Plaintiff could unilaterally amend the MOU in 2024 to include payment for Plaintiff from a deal that began in December 2018 and was completed in 2023. Therefore, the Court finds that the MOU does not allow for Plaintiff's unilateral modification.

Even though the contract does not allow for unilateral modification, "[u]nder New York law, parties may modify a contract by another agreement, by course of performance, or by conduct amounting to waiver or estoppel." *Kaplan* v. *Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) (summary order) (internal quotation marks omitted) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003)). A contract can only be modified by the parties' course of conduct if it "evince[s] a meeting of the minds." *O'Grady* v. *BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015) (citing *Beacon Terminal Corp.* v. *Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (2d Dep't 1980)). And, of course, "[c]ontract modification requires proof of each element

42

requisite to the formation of a contract, including 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Kaplan*, 526 F. App'x at 72 (quoting *Express Indus. & Terminal Corp.*, v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).

In support of his claim, Plaintiff alleges that he introduced Cox to UGE (SAC ¶¶ 12-13), and he submits emails between Cox and a third party that reference the Smithville Project but make no mention of Plaintiff (*id.*, Ex. F). However, Plaintiff has provided no evidence that the parties had any specific communications regarding contract modification.  Plaintiff has not shown that the parties discussed either the service to be provided as consideration for the modification or payment terms, both of which are essential elements of a valid contract.  *See Roelcke* v. *Zip Aviation, LLC*, 571 F. Supp. 3d 214, 230 (S.D.N.Y. 2021).  The email communications he cites in support of his claim that the parties modified the agreement simply do not substantiate a finding that the parties agreed to modify the contract terms.  *See, e.g.*, *JER Realty, LLC* v. *Pick & Pack Hub, LLC*, 231 N.Y.S.3d 184, 186 (2d Dep't 2024) (finding no indication in email communications between the parties that the plaintiff assented to modification of contract term).

The Court thus concludes that, even under the more lenient standard applied to *pro se* plaintiffs, Plaintiff does not sufficiently allege that the parties' communications reflect a "meeting of the minds" concerning the terms of the

Smithville Project.  His breach of contract claim regarding the Smithville Project

fails for lack of mutual assent regarding its addition to the MOU.

### c.    Plaintiff Does Not Plausibly Allege Unjust Enrichment

In addition to his breach of contract claim, Plaintiff brings a quasi-

contract claim for unjust enrichment.  (SAC ¶¶ 29-31).  Quasi-contract claims

are "obligation[s] the law creates in the absence of any agreement."  *Exch.*

*Listing, LLC* v. *Inspira Techs., Ltd.*, 661 F. Supp. 3d 134, 152 (S.D.N.Y. 2023)

(quoting *Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d

Cir. 2011)).  Defendants contend that Plaintiff cannot bring an unjust

enrichment claim because the underlying October 25 MOU is an enforceable

contract.  (Def. Br. 16).  It is true that, in general, plaintiffs cannot recover for

unjust enrichment when "there is an enforceable agreement and the same

damages are sought."  *Pro. Merch. Advance Cap., LLC* v. *C Care Servs., LLC*,

No. 13 Civ. 6562 (RJS), 2015 WL 4392081, at *6 (citing *Staudinger Franke*

*GMBH* v. *Casey*, No. 13 Civ. 6124 (JGK), 2015 WL 356109, at * 9 (S.D.N.Y.

June 8, 2015)).  However, while the Court has found that the MOU does not

allow for unilateral modification, it assumes (without deciding) that the MOU is

otherwise enforceable.  Since the parties dispute whether the Smithville Project

is part of the MOU, the Court will proceed with an unjust enrichment analysis.

*See Keybanc Cap. Mkts., Inc.* v. *Extreme Steel, Inc.*, 710 F. Supp. 3d 239, 247

(S.D.N.Y. 2024) ("[C]ourts regularly allow plaintiffs to maintain unjust

enrichment and quantum meruit claims as pleadings in the alternative at the

motion to dismiss stage where … the parties dispute the existence of a

contract, or where the claims arise out of agreements or understandings of the parties that were not expressly written in the contract." (internal quotation marks omitted and alteration adopted)).

"Unjust enrichment is 'a New York common law quasi-contract cause of action requiring the plaintiff to establish: "[i] that the defendant benefitted; [ii] at the plaintiff's expense; and [iii] that equity and good conscience require restitution."'" *MaxEn Cap. Advisors, Ltd.* v. *Pure Lithium Corp.*, No. 24 Civ. 2231 (GHW), 2024 WL 4520062, at *10 (S.D.N.Y. Oct. 17, 2024) (quoting *Myun-Uk Choi*, 890 F.3d at 69 (quoting *Kaye*, 202 F.3d at 616)).  Furthermore, a plaintiff must show a clear causal relationship between a defendant's profits and his injury.  *Poller* v. *BioScrip, Inc.*, 974 F. Supp. 2d 204, 236 (S.D.N.Y. 2013) (quoting *St. John's Univ., N.Y.* v. *Bolton*, 757 F. Supp. 2d 144, 182 (E.D.N.Y. 2010)).

Plaintiff seeks compensation for introductions made between Defendants and UGE, but Plaintiff has failed to establish a causal connection between Defendants' enrichment and Plaintiff's injury.  Plaintiff alleges that UGE purchased the Smithville Project and that Plaintiff introduced Defendants to UGE.  (SAC ¶¶ 12-13, 18).  As mentioned above, Plaintiff also cites email exchanges between Defendants and a third party in which the Smithville deal is mentioned.  (*Id.*, Ex. F).  Finally, Plaintiff cites a marketing email that he claims to have sent to UGE at Defendants' request in 2020.  (*Id.*, Ex. E).

The Court finds these facts insufficient to show unjust enrichment. Plaintiff's business model resembles those in "finder's fee" cases where

individuals receive compensation for introductions made on behalf of other parties. *See generally Rosenblatt* v. *Christie, Manson & Woods Ltd.*, No. 04 Civ. 4205 (PKC), 2005 WL 2649027, at *5 (S.D.N.Y. Oct. 14, 2005), *aff'd sub nom. Rosenblatt* v. *Christie*, 195 F. App'x 11 (2d Cir. 2006) (summary order).  To receive compensation for introductions in finder's fee cases, "there must be a causal connection between the introduction made by the finder and the ultimate transaction in order for the finder to recover." *Id.* at *5.  Furthermore,

> [t]o establish [the required connection], the courts have consistently required that the finder show more than that his service was a necessary "but for" condition. Rather, the finder must show that the final deal which was carried through flowed directly from [the] introduction. He must establish a continuing connection between the finder's service and the ultimate transaction.

*Moore* v. *Sutton Res., Ltd.*, No. 96 Civ. 7522 (RWS), 1998 WL 67664, at *4 (S.D.N.Y. Feb. 18, 1998) (citations and internal quotation marks omitted), *aff'd*, 165 F.3d 14 (2d Cir. 1998).

According to Plaintiff, he introduced Defendants to UGE in 2020, and the Smithville Project was ultimately sold to UGE in 2023.  (SAC ¶¶ 12-13, 18).  Plaintiff has not provided any evidence showing that he had a continuing relationship with Defendants and UGE beyond the introductory Zoom call.  (*Id.* ¶ 13).  Thus, Plaintiff has not shown that the deal "flowed directly from [his] introduction[ ]" made three years prior to the sale of the deal.  *Moore*, 1998 WL 67664, at *4.  Therefore, even accepting his factual allegations, Plaintiff does

not sufficiently allege a "causal nexus" between the benefit to Defendants and Plaintiff's injury. *Poller*, 974 F. Supp. 2d at 236.

Finally, the Court must determine "whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Tasini* v. *AOL, Inc.*, 851 F. Supp. 2d 734, 740 (S.D.N.Y. 2012) (internal quotation marks omitted), *aff'd*, 505 F. App'x 45 (2d Cir. 2012) (summary order). "Courts applying New York law require a plaintiff to allege some expectation of compensation that was denied in order to demonstrate that equity requires restitution." *Id.* Plaintiff claims that "for deals where Plaintiff only made introductions ... Plaintiff was entitled to a 30% share of profits." (SAC ¶ 11). Plaintiff also submits an email from Cox showing that Defendants were going to pay Plaintiff a thirty percent fee for another deal. (*Id.*, Ex. G). This other deal, however, was never completed. (Dkt. #1 ¶ 16 (stating that "[i]n 2019, Defendants failed to complete projects set up by Plaintiff")). Plaintiff has alleged no facts showing he had a reasonable expectation of receiving a thirty percent fee for the Smithville Project. As noted in the MOU, the thirty percent fee for a previous contemplated deal was one option "agreed upon on a case by case basis." (October 25 MOU; December 6 MOU). According to Plaintiff, Cox "receiv[ed] financial benefits exceeding $350,000[]" from the sale of the Smithville deal to UGE. (SAC ¶ 18). Plaintiff seeks recovery of this $350,000 but nowhere alleges that he expected to be entitled to one hundred percent of Cox's benefit to any of the deals the parties in fact contemplated. As such, even if Plaintiff could show that Defendant benefited at Plaintiff's expense,

47

Plaintiff has not shown that his expectation of compensation demonstrates that "equity requires restitution."  *Tasini*, 851 F. Supp. 2d at 740.

> ### d.    Plaintiff Does Not Plausibly Allege Tortious Interference with a Contract

To state a claim under New York law for tortious interference with a contract, a plaintiff must allege: "[i] the existence of a valid contract between the plaintiff and a third party; [ii] the defendant's knowledge of the contract; [iii] the defendant's intentional procurement of the third party's breach of the contract without justification; [iv] actual breach of the contract; and [v] damages resulting therefrom."  *Kirch*, 449 F.3d at 401 (internal quotation marks omitted) (quoting *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)); *accord Regeneron Pharms., Inc.* v. *Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024).  "Additionally, a plaintiff must allege that the defendant's actions were the 'but for' cause of the alleged breach — in other words, that there would not have been a breach but for the activities of the defendant."  *Clean Coal Techs., Inc.* v. *Leidos, Inc.*, 377 F. Supp. 3d 303, 319 (S.D.N.Y. 2019) (internal quotation marks omitted) (quoting *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (summary order)).

The Court finds that Plaintiff has not alleged any element of tortious interference with a contract.  Plaintiff alleges that Defendants "intentionally and improperly interfered with [his relationship with UGE] by circumventing Plaintiff and engaging directly with UGE[.]" (SAC ¶ 27).  At the threshold, Plaintiff has not sufficiently alleged the existence of a contract between UGE

48

and him (or his LLC).  Furthermore, Plaintiff alleges only in a conclusory fashion that Defendants' conduct in making a sale to UGE has caused the "end of his relationship with UGE International."  (*Id.* ¶ 28).

In sum, even considering the merits of Plaintiff's claims, the Court finds that he has failed to allege a viable claim for relief.  Accordingly, if a reviewing court were to disagree with the Court's jurisdictional analysis, it should instead dismiss the claims with prejudice for failure to state a claim upon which relief could be granted.

## D. The Court Dismisses Plaintiff's Claims with Prejudice and Imposes Sanctions

### 1. Applicable Law

Finally, Defendants request that the Court exercise its inherent power to impose sanctions on Plaintiff.  (Def. Br. 20-24).  Defendants seek monetary sanctions covering attorney's fees of $21,838.80 and dismissal of Plaintiff's claims with prejudice.  (*Id.* at 21, 24).  "A court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court."  *Yukos Cap. S.A.R.L.* v. *Feldman*, 977 F.3d 216, 235 (2d Cir. 2020).  "[A] court's inherent power allows it to impose monetary sanctions against a litigant (or its counsel) for misconduct."  *Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 991 F.3d 361, 367 (2d Cir. 2021) (citing *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).  But that power "must be exercised with restraint and discretion."  *Id.* at 368 (quoting *NASCO, Inc.*, 501 U.S. at 44).  In particular, "[w]hen it comes to monetary sanctions," a court "should sanction only bad faith, vexatious, or wanton acts or actions otherwise

49

undertaken for oppressive reasons." *Id.* (internal quotation marks omitted and alterations adopted).

A fraud on the court is sanctionable conduct that occurs where a party "[i] improperly influences the trier; [ii] unfairly hampers the presentation of the opposing party's claim or defense; [iii] lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth finding process; or [iv] knowingly submits fraudulent documents to the Court." *Passlogix, Inc.* v. *2FA Tech., LLC*, 708 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) (internal quotation marks and citations omitted and alteration adopted) (citing *McMunn* v. *Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002); *Scholastic, Inc.* v. *Stouffer*, 221 F. Supp. 2d 425, 443 (S.D.N.Y. 2002)).

A court should not impose sanctions for a fraud on the court "unless it finds, by clear and convincing evidence, that the party or attorney knowingly submitted a materially false or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly." *Braun ex rel. Advanced Battery Techs., Inc.* v. *Zhiguo Fu*, No. 11 Civ. 4383 (CM) (DF), 2015 WL 4389893, at *17 (S.D.N.Y. July 10, 2015). A court has the inherent authority "to conduct an independent investigation in order to determine whether it has been the victim of fraud." *NASCO*, 501 U.S. at 44 (citing *Universal Oil Prods. Co.* v. *Root Refin. Co.*, 328 U.S. 575, 580 (1946)). To do so, it "must examine the record with respect to … the … piece[ ] of allegedly

50

falsified evidence." *Scholastic*, 221 F. Supp. 2d at 440.  Additionally, before

imposing sanctions pursuant to their inherent authority, courts in this District

consider

> [i] whether the misconduct was the product of
> intentional bad faith; [ii] whether and to what extent the
> misconduct prejudiced the other party; [iii] whether
> there is a pattern of misbehavior, rather than an
> isolated instance; [iv] whether and when the
> misconduct was corrected; and [v] whether further
> misconduct is likely to continue in the future.

*Fischman* v. *Mitsubishi Chem. Holdings Am., Inc.*, No. 18 Civ. 8188 (JMF), 2022

WL 3646205, at *2 (S.D.N.Y. Aug. 24, 2022) (quoting *McMunn*, 191 F. Supp. 2d

at 446).

The Second Circuit has provided additional guidance for courts

considering case-terminating (or "terminal") sanctions.  *See Rossbach* v.

*Montefiore Med. Ctr.*, 81 F.4th 124, 137-42 (2d Cir. 2023).  As relevant here, the

Court observed that a district court could impose terminal sanctions under its

inherent power, where a party "has acted in bad faith, vexatiously, wantonly, or

for oppressive reasons." *Id.* at 141 (quoting *Ransmeier* v. *Mariani*, 718 F.3d 64,

68 (2d Cir. 2013) (internal quotation marks omitted)).  The Court cautioned,

however, that

> "[T]he sanction of dismissal with prejudice ... should be
> used ... only upon a finding of willfulness, bad faith, or
> reasonably serious fault."  *Mitchell* v. *Lyons Pro. Servs.*,
> Inc., 708 F.3d 463, 467 (2d Cir. 2013) (internal
> quotation marks and citations omitted).  Likewise, our
> "case law is clear that a district court may not impose
> attorney's fees as a sanction without first making an
> explicit finding that the sanctioned party, whether a
> party or a party's counsel, acted in bad faith in engaging

> in the sanctionable conduct." *Wilson* v. *Citigroup, N.A.*,
> 702 F.3d 720, 724 (2d Cir. 2012) (per curiam).

*Id.* at 142.  Finally, the Court noted that district courts were obligated to "'at least consider lesser remedial measures before imposing' the sanction of dismissal." *Id.* at 141 (quoting *Shepherd* v. *Annucci*, 921 F.3d 89, 97 (2d Cir. 2019)).[9]

### 2.    Analysis

### a.    Dismissal with Prejudice Is Warranted

The Court finds, based on clear and convincing evidence, that Plaintiff has submitted a fraudulent document to the Court.  Plaintiff has filed a version of the MOU that appears to have been signed by both parties to the contract on December 6, 2018.  (December 6 MOU).  As mentioned throughout this Opinion, the only difference between Plaintiff's version of the MOU and Defendants' version of the MOU is the added clause about the Smithville Project.  (*Id.*; October 25 MOU).  But — and the Court cannot emphasize this enough — that clause is the fulcrum on which Plaintiff's entire lawsuit rests, and it is wholly fabricated.

To review, the added clause states that the MOU was "shown to ENGL, UGE and Qcells 2020-2022 70/30 GBS. Amended."  (December 6 MOU).

---

[9]    Elsewhere in its opinion, the *Rossbach* court stated that potential recipients of sanctions are entitled to notice and an opportunity to be heard prior to the imposition of sanctions.  *See Rossbach* v. *Montefiore Med. Ctr.*, 81 F.4th 124, 140 (2d Cir. 2023).  It did not consider a notice argument in the course of resolving the appeal, inasmuch as the argument had not been preserved.  *Id.*  In point of fact, the district court had provided the requisite notice and opportunity to be heard.  *See Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 3421569, at *6 & n.9 (S.D.N.Y. Aug. 5, 2021), *aff'd in part, vacated in part on other grounds, remanded*, 81 F.4th 124 (2d Cir. 2023).

However, by Plaintiff's own admission, he did not introduce Defendants to UGE until January 2020.  (SAC, Ex. C).  Indeed, according to the exhibits to Plaintiff's SAC, *Defendants* first told Plaintiff about the Smithville Project in 2019.  (*Id.*, Ex. D).  As such, it would have been impossible for Plaintiff to show the MOU to UGE in 2018 (the year of the signatures) regarding the Smithville Project that Defendants would not have until 2019.  Furthermore, Plaintiff acknowledged in an email to Defendants that he unilaterally added the Smithville Project to the MOU in February 2024.  (Cox Decl., Ex. D).[10]  The December 6 MOU also contains certain modifications to the document's spacing and font selection that underscore its inauthenticity.  (December 6 MOU).  Accordingly, the Court finds clear and convincing evidence that Plaintiff "knowingly submit[ed] [a] fraudulent document[ ] to the Court."  *Passlogix, Inc.*, 708 F. Supp. 2d at 395 (quoting *Scholastic*, 221 F. Supp. 2d at 443); *see also Hargrove* v. *Riley*, No. 04 Civ. 4587 (DGT), 2007 WL 389003, at *11 (E.D.N.Y. Jan. 31, 2007) (dismissing with prejudice where "a visual examination of the documents themselves" showed that the document submitted by the plaintiff was fraudulent).

The Court also finds that Plaintiff has acted in bad faith.  Plaintiff first submitted the fabricated document as an attachment to his SAC.  Then, in response to Defendants' claims that Plaintiff fabricated the December 6 MOU, Plaintiff stated that "the MOU does not prohibit amendments nor say that they

---

[10]    As noted above, the Court may consider this email because courts may review evidence in the record when determining if a document has been falsified.  *See Scholastic, Inc.* v. *Stouffer*, 221 F. Supp. 2d 425, 440 (S.D.N.Y. 2002).

must mutually be signed off on," and insisted that "there is no basis for sanctions." (Pl. First Opp. 5; Pl. Second Opp. 3). In fact, Plaintiff asserts that he has "acted in good faith and complied with all legal and ethical standards." (Pl. Second Opp. 3). It seems that Plaintiff does not intend to remove the December 6 MOU from his pleadings, though he all but admits to fabricating the document in 2024. The Court considers Plaintiff's failure to correct his actions and admit that he has submitted a fabricated document to be evidence of his acting in bad faith.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *NASCO*, 501 U.S. at 44 (citing *Roadway Express Inc.* v. Piper, 447 U.S. 752, 764 (1980)). "[T]he imposition of sanctions pursuant to a court's inherent authority is truly discretionary." *Yukos Cap.*, 977 F.3d at 235 (citing *Murray* v. *City of Columbus*, 534 F. App'x 479, 485 (6th Cir. 2016) (unpublished decision)). Furthermore, before any motion for sanctions is granted, a party must receive

> specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on the matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges.

*Sakon* v. *Andreo*, 119 F.3d 109, 114 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Ted Lapidus, S.A.* v. *Vann*, 112 F.3d 91, 97 (2d Cir. 1997)). Plaintiff has received appropriate notice and an opportunity to be heard, and does not contend otherwise.

Defendants ask the Court to dismiss this case with prejudice.  (Def. Br. 24).  As a sanction, "outright dismissal of a lawsuit … is within the court's discretion."  *NASCO*, 501 U.S. at 45 (citing *Roadway Express Inc.*, 447 U.S. at 765).  However, "dismissal is permissible only when the deception relates to matters in controversy in the action, and even then is so harsh a remedy that it should be imposed only in the most extreme circumstances."  *In re Dynex Cap., Inc. Sec. Litig.*, No. 05 Civ. 1897 (DF), 2011 WL 2581755, at *3 (S.D.N.Y. Apr. 29, 2011) (internal quotation marks omitted) (quoting *Sanchez* v. *Litzenberger*, No. 09 Civ. 7207 (THK), 2011 WL 672413, at *5 (S.D.N.Y. Feb. 24, 2011)), *report and recommendation adopted*, No. 05 Civ. 1897 (HB), 2011 WL 2471267 (S.D.N.Y. June 21, 2011); *see also Braun*, 2015 WL 4389893, at *17.

As presaged by the Court's extensive analysis, Plaintiff's SAC was going to be dismissed by this Court in any event; the only question is whether the dismissal would be with or without prejudice.  The record here supports dismissal with prejudice.  The fabricated December 6 MOU, which is the contract at issue in this action, clearly "relates to matters in controversy."  *In re Dynex Capital, Inc. Sec. Litig.*, 2011 WL 2581755, at *3.  Furthermore, Plaintiff received and responded to Defendants' brief, which informed him of the "conduct alleged to be sanctionable."  *Sakon*, 119 F.3d at 114.  Plaintiff has failed to explain why he submitted a document with mismatched dates and signatures.  In fact, Plaintiff denied fabricating evidence and insisted that he "acted in good faith." (Pl. Second Opp. 3).  That is unacceptable.  The Court accordingly dismisses Plaintiff's claims with prejudice.  *See, e.g.*, *Hargrove*,

2007 WL 389003, at * 11 (dismissing *pro se* plaintiff's case with prejudice for "improperly duplicating notary stamps on complaint letters to make them look authentic").

### b.    A Monetary Sanction Is Warranted

Turning to monetary sanctions, since Plaintiff has submitted a fraudulent document to the Court, the Court finds that monetary sanctions are necessary to advance the goals of specific and general deterrence.  "'It is well established that a federal court may consider collateral issues after an action is no longer pending,' including 'after an action is dismissed for want of jurisdiction.'"  *Eletson Holdings Inc.* v. *Levona Holdings Ltd.*, No. 23 Civ. 7331 (LJL), 2025 WL 893686, at *7 (S.D.N.Y. Mar. 24, 2025) (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 395 (1990)).  The Supreme Court has held that a court may impose Rule 11 sanctions despite lacking jurisdiction, and Courts in this District have extended this holding to actions taken pursuant to the Court's "inherent authority."  *See Willy* v. *Coastal Corp.*, 503 U.S. 131, 138 (1992); *Schlaifer Nance & Co.* v. *Est. of Warhol*, 194 F.3d 323, 333 (2d Cir. 1999); *Eletson Holdings Inc.*, 2025 WL 893686, at *7.  "Thus, even when a district court lacks … jurisdiction over an underlying action, it still possesses jurisdiction to impose sanctions arising from the underlying case."  *Schlaifer Nance & Co.*, 194 F.3d at 333 (citing *Willy*, 503 U.S. at 137-39).

As Defendants note in their brief, a court may order a plaintiff to pay the opposing party's attorneys' fees as a form of sanctions.  (Def. Br. 24 (citing *Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020 WL 5512718, at *12 (S.D.N.Y.

Sept. 9, 2020))).  Sanctions imposed pursuant to Rule 11 and the Court's inherent sanctions power may also include "a fine payable to the Clerk of the Court."  *Xu* v. *UMI Sushi, Inc.*, No. 15 Civ. 4710 (RJS), 2016 WL 3523736, at *4 (S.D.N.Y. June 21, 2016) (citing *Woo* v. *City of New York*, No. 93 Civ. 7007 (HB) (AJP), 1996 WL 284930, at *2 (S.D.N.Y. May 29, 1996); *Miltope Corp.* v. *Hartford Cas. Ins. Co.*, 163 F.R.D. 191, 195 (S.D.N.Y. 1995)).  Fines are imposed to acknowledge "[d]ue regard for the need to vindicate the public interest in the sound administration of justice."  *Miltope Corp.*, 163 F.R.D. at 195 (internal citation omitted); *see also Cognex Corp.* v. *Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 421 (S.D.N.Y. 2013) (imposing a fine payable to Clerk of the Court in order "to provide an adequate deterrent to such conduct in the future").

While a court may impose attorneys' fees as a form of sanction, courts are not required to do so where they find that a "more narrowly tailored sanction … is more appropriate."  *Passlogix, Inc.*, 708 F. Supp. 2d at 422; *see also Goldman* v. *Barrett*, No. 15 Civ. 9223 (PGG), 2019 WL 4572725, at *5-6 (S.D.N.Y. Sept. 20, 2019) (imposing sanctions of $10,000 rather than $205,195 because the latter amount was "excessive, and far beyond 'what suffices to deter repetition of the conduct or comparable conduct by others similarly situated'" (quoting Fed. R. Civ. P. 11(c)(4))).  Ultimately, the decision whether to impose sanctions is left to the court's discretion.  *See Usherson* v. *Bandshell Artist Mgmt.*, No. 19 Civ. 6368 (JMF), 2020 WL 3483661, at *10 (S.D.N.Y. June 26, 2020) (citing *Macolor* v. *Libiran*, No. 14 Civ. 4555 (JMF), 2015 WL

337561, at *2 (S.D.N.Y. Jan. 23, 2015)).  Furthermore, courts have noted that fines paid to counsel are "compensatory" in nature, whereas fines payable to the Court "serve as a deterrent to others who might otherwise be tempted to engage in such behavior."  *Hart* v. *Blanchette*, No. 13 Civ. 6458 (CJS), 2019 WL 1416632, at *29 (W.D.N.Y. Mar. 29, 2019) (citing *Miltope Corp.*, 163 F.R.D. at 194); *see also Xu*, 2016 WL 3523736, at *4; *cf. Eisemann* v. *Greene*, 205 F.3d 1322, 1322 (2d Cir. 2000) (summary order) (upholding reallocation of half of the sanctions amount to the court instead of fully to opposing counsel).  In cases such as this one, "the burden … falls as much on the court — and therefore on the taxpayers — as on the parties," and "[a]n appropriate sanction should also take into account the waste of judicial time and resources occasioned by the violation."  *Novelty Textile Mills, Inc.* v. *Stern*, 136 F.R.D. 63, 76, 78 (S.D.N.Y. 1991).

In the exercise of their discretion, courts in this District have imposed sanctions in the form of attorneys' fees, as flat fees paid to the burdened parties in lieu of attorneys' fees, and/or as fines payable to the Court.  *See, e.g.*, *Rossbach*, 81 F.4th at 144; *McMunn*, 191 F. Supp. 2d at 462.  Defendants ask the Court to impose attorneys' fees totaling $21,838.80.  (Def. Br. 24).  However, given the marginal quality of defense counsel's briefing, the relative straightforwardness of the motion to dismiss, and the fact that Plaintiff could have alleged breach of contract and quasi-contract claims (albeit lacking merit) regardless of the falsified document he submitted, the Court finds, in its discretion, that "compensatory" attorneys' fees are not warranted, *cf.*

*Eisemann*, 205 F.3d at 1322, and that a "more narrowly tailored" fine is instead appropriate, *Passlogix, Inc.*, 708 F. Supp. 2d at 422.

Courts in this District have imposed fines on parties ranging from $5,000 to $25,000 for matters such as submitting fraudulent documents, making misleading statements, spoliation of evidence, and wasting judicial resources. *See, e.g.*, *Passlogix, Inc.*, 708 F. Supp. 2d at 422 (imposing a $10,000 fine on defendants for spoliation of evidence to "serve[ ] the dual purposes of deterrence and punishment"); *McMunn*, 191 F. Supp. 2d at 460 (imposing a $20,000 fine on the plaintiff for committing fraud on the court); *see also Mata* v. *Avianca, Inc.*, 678 F. Supp. 3d 443, 466 (S.D.N.Y. 2023) (ordering an attorney to pay a fine of $5,000 to the court pursuant to Rule 11 and the court's inherent authority); *Macolor* v. *Libiran*, No. 14 Civ. 4555 (JMF), 2015 WL 1267337, at *5 (S.D.N.Y. Mar. 18, 2025) (imposing a second $6,000 fine on top of an initial $3,000 fine for an attorney's "continued failure to obey the [c]ourt's orders" and for "lying to the [c]ourt about his conduct); *Hong* v. *Mommy's Jamaican Mkt. Corp.*, No. 20 Civ. 9612 (LJL), 2024 WL 3824394, at *21 (S.D.N.Y. Aug. 14, 2025) (imposing a $10,000 fine for "wast[ing] court resources in needlessly prolonging [the] litigation for three years"); *Cognex Corp.*, 990 F. Supp. 2d at 421 (ordering the plaintiff to pay the Clerk of Court $25,000 for spoliation of evidence).

The Court finds, after considering relevant factors such as Plaintiff's status as a *pro se* litigant, the severity of submitting falsified documents, the importance of the falsified document to this action, and the need to deter

similar conduct, that monetary sanctions are justified.  In the Court's discretion, it fines Plaintiff in the amount of $10,000, payable to the Court, which is "sufficient but not more than necessary" to advance the Court's goals of specific and general deterrence.  *Mata*, 678 F. Supp. 3d at 466.

**CONCLUSION**

For the above reasons, Defendants' motion to dismiss is GRANTED. Pursuant to its inherent authority, the Court dismisses Plaintiff's claims with prejudice and imposes a penalty of $10,000 to be paid into the Registry of this Court within 60 days of the issuance of this Opinion.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:  July 17, 2025
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

60